FRUGÉ, Judge ad hoc.
This suit arises from an automobile accident which occurred on the 25th day of August, 1955 at approximately 9:30 p. m., at Plaquemine, in Iberville Parish. The plaintiff, Simoneaux, was driving his 1949 Hudson automobile. In the automobile with the plaintiff, Simoneaux, was his wife, Mrs. Madeline M. Simoneaux and Mrs. Annie Key Hogan, also plaintiffs herein. Mr. and Mrs. Simoneaux and Mrs. Hogan were variously injured in the accident.
The accident occurred on Louisiana Highway No. 1, on a bridge which traverses Bayou Plaquemine in Iberville Parish, at Plaquemine. The bridge is what is commonly known as a drawbridge. It is a lift span, that is, the center span lifts vertically, as one piece, the entire span remaining parallel to the surface of the road bed, to give room for passage of vessels on the bayou. On the evening in question, the lift span, after being raised for a passing vessel, was returned to its original position, but at the south end of the opening, the span did not seat itself fully. The end of the span halted at a point variously described 5 to 10 inches above the level of the roadway. The lift span is 150 feet from the gates at each end and is itself 150 feet long.
*744 The plaintiff, Clement J. Simoneaux, had stopped his car south of the bridge, awaiting the closing of the bridge, and the opening of the gates and barricade to allow forward movement of traffic going north across the bridge. When the span was lowered and fastened in place, with the south end still above the roadway, as described, the gates and barricades were raised, and plaintiff, Simoneaux, drove his vehicle onto the bridge, and, reaching the lift span, collided with the end of the span, damaging his car, the two other plaintiffs, and himself.
The trial judge rendered judgment in favor of plaintiffs, awarding Mrs. Hogan $11,735.14 in damages, Mrs. Simoneaux $350 and' Mr. Simoneaux $2,663.50. From this judgment, the defendant has appealed.
Mr. Simoneaux, plaintiff herein, testified that he was driving slowly across the bridge to allow the women who were passengers in his vehicle to watch the passing boat. He testified that there were cars approaching from the opposite direction and he was watching them and not the surface of the road. The evidence reveals that he did not put on his brakes and he testified he never did see the elevation in the span.
The bridge in question was operated by two operators, one Mr. Dias, the operator on the night of the accident in question, and one Mr. Couvillion, who was the chief operator of the bridge. Mr. Couvillion testified that the bridge in question on some occasions failed to seat itself properly but had always lowered itself to a degree where traffic could still pass over the bridge. He testified that it was his practice on occasions to descend to the floor of the bridge to check the levels of both approaches before removing the barriers and giving the green signal for the passage of vehicles over the bridge. He testified that it was impossible from the operator’s tower to see the south end of the span.
Mr. Dias, the operator of the bridge on the night of the accident in question, testified that he did not descend to the floor of the bridge to check its level, although on previous occasions, the bridge had not completely seated itself when he operated it. On the night in question, he testified that the lights signalled to him that the bridge was fully seated and, accordingly, he opened' the gates and barricades.
We cannot find any negligence on the part of Mr. Simoneaux, the driver of the vehicle. We do not believe a normal driver, having been given a green signal and all barriers having been lifted indicating there was no danger, would likely notice the variation in the elevation of the roadway and the center span, particularly in view of the fact that other traffic was approaching with lights from the opposite end of the bridge. Once the barriers are lifted and the green light is flashed' giving a signal of safe condition, a driver of a vehicle proceeding across said bridge would certainly feel secure and would not be looking for any variation in the span and the road surface of the bridge.
Photographs were taken of the south end of the bridge in question after the occurrence of this accident and were introduced at the trial of this case. These photographs were taken for the express purpose of pointing out the visual differences between the level of the approach and the center span of the bridge, and all of the photographs are centered on this difference, rather than the circumstances of normal driving when an operator of an automobile is given a go ahead signal and is meeting approaching traffic at night. We might conclude that if the driver should have seen the variance, that is, if it was that obvious to him, then certainly the bridge tender should have seen the variance especially in view that the span did not always seat itself properly, and accordingly, should have never opened the barriers to allow approaching traffic.
 It is true that the jurisprudence of this State has been uniform in holding that a driver should see what he could *745 see and he is negligent if he does not see it. See Jackson v. Cook, 189 La. 860, 181 So. 195; Hogue v. Akin Truck Line, La. App., 16 So.2d 366; Geoghegan v. Greyhound Corporation, 226 La. 405, 76 So.2d 412; King v. Risdon & W. E. Holoman Lumber Company, Inc., La.App., 76 So.2d 548; Arceneaux v. Louisiana Highway Commission, La.App., 5 So.2d 20. However, we believe that this case presents an exception to the general rule in that a normal prudent driver under the circumstances herein presented should not be held to have seen the variance in the span and the roadbed.
The plaintiffs argue that the accident arose from an instrumentality solely in the control of the defendant and that the defendant must explain the accident and refute the possibility of negligence on the part of the defendant as the doctrine of res ipsa loquitur applies.
The evidence reveals that the Department of Highways made regular monthly inspections of this bridge and having had no serious difficulty with the failure of the bridge to seat itself prior to this accident, this explanation should suffice and under the doctrine of res ipsa loquitur it should not be held guilty of negligence.
However, we have noted in the record a variation of operating procedures pursued by the two operators of this bridge. Mr. Dias, the operator on the night of the accident in question, testified that he did not descend to the floor of the bridge to check its level, although he did testify that on some previous occasions the bridge had not completely seated itself when he operated it. However, he testified that when it did not seat itself properly before, he did get a flash signal indicating that it had failed to seat, although the variations were never as great as the five to ten inches variously estimated as being the variance at the time of this accident.
Mr. Couvillion, who was the Chief Operator of the bridge, testified that it was his practice to descend to the floor of the bridge to check the levels of both approaches before removing the barriers and giving the green signal for the passage of vehicles over the bridge.
Inasmuch as the bridge failed to seat itself properly on previous occasions and for the reasons that the chief operator of the bridge testified that it was impossible to check the level of the bridge at the south end from the operator’s elevated position, we believe that the defendant was on notice that the automatic signalling devices of the bridge could not be relied upon entirely and it was their duty to do more than merely rely on the signalling devices of the bridge.
In the case of Gillis v. Great Atlantic and Pacific Tea Company, La.App., 95 So.2d 186, we held that a supermarket operator was liable to the claim of the plaintiff when the plaintiff was struck by a grocery buggy or cart which rolled down an incline and struck a customer. We concluded in that case that the very evidence by which defendant attempted to show that a loaded grocery buggy, properly placed on the slope in a locking position, or even unlocked if in good working order, could not have rolled so as to strike the plaintiff, if it had been properly placed in a locking position or if it was in a proper non-rolling condition.
If the safety devices on the bridge were in proper working order, including the locking devices, the bridge floor would have seated itself at a safe level with the approach of the highway, and accordingly, this accident would not have occurred. The very fact that adjustments are regularly made to the bridge and the very fact that it failed to seat itself on prior occasions when the safety devices indicated a level bridge constitutes sufficient warning to the defendant the mechanical devices were not infallible.
With reference to damages counsel for defendant does not argue with the amount awarded to plaintiff, Clement J. Simoneaux, in the sum of $2,663.50 and. *746 Mrs. Madeline M. Simoneaux in the sum of $350 nor does counsel for plaintiff argue that said amounts are inadequate. However, as to the sum of $11,735.14 awarded to Mrs. Annie Key Hogan, the other plaintiff, counsel for defendant argues that the damages are excessive and should be reduced.
Mrs. Hogan was 58 years of age at the time of the accident. She received a severe fracture of the left humerus with considerable displacement. She also received a fracture of the left tibial plateau and a severe blow in the vicinity of the mouth and nose. Subsequent to the accident, she was hospitalized for a period of six days, during which time the left arm was placed in a “hanging cast” and the left leg was placed in a cast and she could not place weight on this leg for a two month period afterward.
Dr. Campanella, who testified, stated:
“ * * * she was bedridden but not in a manner that you and I would go to bed. She had this so called hanging cast applied, which means that the cast must hang at all times, and therefore she had to sit up in bed rather than go in bed flat, and that was for a period of about six weeks until the fractures were more or less glued together, and then she could go ahead and use pillows and sleep normally. However, this was complicated also by the fact that (she) had this cast on her leg and no weight was allowed for at least two months on this leg.”
It was approximately three and one-half months after the accident that the doctor permitted full weight bearing on the left knee, and permitted her to start moving around. Afterwards she was allowed on crutches and she remained on crutches for at least an additional six months. On March 17, 1958, approximately two years and eight months after the accident, Dr. Campanella found Mrs. Hogan still had deformity of the arm and she still showed a lump or callous formation about the fracture site. He was of the opinion that she had muscular weakness and evaluated permanent disability of the left arm at 10%. He also found atrophy in the leg which she had fractured which he stated could be attributed to her age and to her fear of using the leg. The lower court allowed $10,000 to Mrs. Hogan for her pain and suffering and while there are some cases as cited by counsel for defendant where the courts have not allowed as much damages, we have continuously held that each case stands on its own and do not believe that the trial judge was manifestly erroneous in this award.
Accordingly, for the foregoing reasons, the judgment appealed from is affirmed at appellant’s cost.
Affirmed.